## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 30 2018

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

CTHC Holdings, LLC, )
                Plaintiff, )
vs. )
  )
  )
First Capital Real Estate Investments, LLC, )
United Realty Capital Operating Partnership, ) Case No. 4:18-cv-00106-JM
LP, and Suneet Singal )
                Defendants. )
  )
  )

### FIRST AMENDED COMPLAINT

COMES NOW the Plaintiff, CTHC Holdings, LLC, by and through its attorneys, Gill Ragon Owen, P.A., and for its First Amended Complaint against the Defendants, First Capital Real Estate Investments, LLC, United Realty Capital Operating Partnership, LP, and Suneet Singal, states as follows:

### PARTIES, JURISDICTION & VENUE

1. Plaintiff CTHC Holdings, LLC ("Plaintiff"), is an Arkansas limited liability company having its principal address in Saline County, Arkansas.

2. Defendant First Capital Real Estate Investments, LLC ("First Capital") is a California limited liability company.

3. Defendant United Realty Capital Operating Partnership, LP ("United Realty") is a New York limited partnership.

4. Suneet Singal ("Singal") is a citizen of the State of California.

5. This Court has jurisdiction over this action because there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds $75,000 exclusive of interest and costs. 28 U.S.C. § 1332(a).

6.     Venue is proper before this Court because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Eastern District of Arkansas. 28 U.S.C. 1391.

## FACTS

7.     On or about December 2, 2016, Defendant Singal negotiated a loan transaction with Heartland Bank (the "Lender") on behalf of Freedom Capital Investment Advisors LLC and Freedom Capital Investment Management LLC (collectively, "Borrowers") and Defendants.

8.     Upon information and belief, First Capital and United Realty are owned and/or otherwise affiliated with the Borrowers.

9.     Following these negotiations, on or about December 2, 2016, Lender made a loan in the principal amount of $863,487.00 (the "Loan") to Borrowers.

10.     Contemporaneously with the Loan, and as collateral for the Loan, Plaintiff provided a mortgage (the "Mortgage") upon certain real property in Saline County, Arkansas (the "Mortgaged Property"). Copies of the Limited Liability Company Resolution to Grant Collateral (the "Resolution") and the Mortgage are collectively attached hereto as **Exhibit A**.

11.     In order to induce Plaintiff to execute the Mortgage, Singal, on behalf of First Capital, executed and delivered to Plaintiff a Pledge and Security Agreement (the "Agreement") whereby First Capital pledged to Plaintiff "all of those certain 466,565 OP Units and equity ownership and stock interest in United Capital Operating Partnership, LP," certificate number UROP-100107 (the "OP Units"). A copy of the Agreement is attached hereto as **Exhibit B**.

12.     Section 2.1 of the Agreement provides:

2.1     Grant of Security Interest.

(a)     As collateral security for the [Plaintiff] to provide the Mortgage, [First Capital] hereby pledges and grants to [Plaintiff] (including its Affiliates), a second priority Lien on and security

2

> interest in and to, and agrees and acknowledges that [Plaintiff] has and shall continue to have, a Security Interest in and to, all of [First Capital's] right, title and interest in and to the Pledged Equity Interests and all Proceeds of the Pledged Equity (all of the property being described in the preceding clauses the "*Collateral*"), whether now owned or hereafter acquired, wherever located, howsoever arising or created and whether now existing or hereafter arising, existing or created; subordinate to the prior lien of Lender.

(The interests, proceeds, and property defined as "Collateral" in Section 2.1(a) of the Agreement quoted above are herein referred to collectively as the "Collateral.").

14. To further secure Plaintiff's lien on the Collateral, on November 6, 2017, Plaintiff filed a UCC-1 Financing Statement (the "UCC") with the California Secretary of State, Filing Number 17-7614938945. A copy of the UCC is attached hereto as **Exhibit C**.

14. Plaintiff's lien on the Collateral is a first priority lien.

15. Section 5.1 of the Agreement provides that First Capital shall be in default under the Agreement "upon the occurrence and during the continuance of an Event of Default under the Loan...." *See* Exhibit B.

16. On October 31, 2017, the Lender sent the Borrowers a Notice of Default and Acceleration letter ("Notice of Default") stating that an Event of Default under the Loan had occurred. A copy of the Notice of Default is attached hereto as **Exhibit D**.

17. On November 7, 2017, Plaintiff sent First Capital a Demand Letter pursuant to the terms of the Agreement. A copy of the Demand Letter is attached hereto as **Exhibit E**. The Demand Letter stated that First Capital must immediately:

> (1) cure the Event of Default, (2) provide us with true, complete and accurate books and records with respect to United Realty Capital Operating Partnership, LP and the Pledged Equity Interests, including, without limitation, a copy of the current partnership agreement of Realty Capital Operating Partnership, LP, as amended, and its most current available financial statements, (3) provide us with originals of all certificates evidencing any Pledged Equity Certificates, and (4) deliver to CTHC any future certificates

3

relating to the Pledged Equity Certificates and any proceeds or distributions in connection therewith.

18. As of the filing of this Complaint, First Capital has failed to cure the Event of Default or deliver the OP Units.

19. In response to discovery requests propounded by Plaintiff in this case, Singal on behalf of both First Capital and United Realty, has declared under penalty of perjury that the following documents "do not exist and/or are not in possession of the Defendant":

    a. Books and records regarding the OP Units and their value;

    b. Certificates related to the OP Units;

    c. Documents relating to the OP Units;

    d. Documents relating to any proceeds or any other distributions relating to the OP Units.

20. Based on these responses, Plaintiff has reason to believe that the OP Units do not exist and did not exist at the time Singal executed the Agreement on behalf of First Capital.

21. Accordingly, during negotiation of the Loan, Mortgage, and Agreement, Singal made knowingly made multiple false representations regarding the existence, value, and liquidity of the OP Units.

22. Singal affirmed these false representations by executing the Agreement on behalf of First Capital.

23. Singal made these false representations with the intent and knowledge that Plaintiff rely on them in executing the Mortgage and entering into the Agreement.

24. These representations induced Plaintiff to execute the Mortgage and enter into the Agreement.

4

## COUNT I—FRAUD

25.     The allegations in the preceding paragraphs are incorporated herein by reference.

26.     During the negotiation of the Loan, Mortgage, Singal made multiple false representations to Plaintiff regarding the existence, value, and liquidity of the OP Units.

27.     Singal's representations led Plaintiff to believe that the OP Units were worth an amount commensurate with value of the principal amount of the Loan and were relatively liquid in that they could be converted to cash if needed without significant effort or expense.

28.     Upon information and belief, the OP Units had not been issued at the time of Singal's representations, and, therefore, had no value or liquidity whatsoever.

29.     Alternatively, if the OP Units do exist, they are worth significantly less than the value of the Mortgaged Property and are essentially illiquid.

30.     Singal knew or should have known his representations were false.

31.     Singal made these false representations and ratified them by signing the Agreement on behalf of First Capital with the knowledge that the representations were the primary incentive for Plaintiff to execute the Mortgage and enter into Agreement.

32.     Singal's false representations were material in Plaintiff's decision to execute the Mortgage and enter into the Agreement.

33.     Plaintiff relied on Singal's false representations in executing the Mortgage and entering into the Agreement.

34.     Because Singal made these false representations as a representative of the Borrowers and Defendants, Plaintiff was justified in its reliance upon Singal's false representations.

35.     Plaintiff suffered damage as a result of its reliance on Singal's false representations in an amount to be determined at trial, but, in any event, not less than $75,000.

## COUNT II—REPLEVIN

36.     The allegations in the preceding paragraphs are incorporated herein by reference.

37.     To the extent the OP Units currently exist or formerly existed, Plaintiff is entitled to the possession of the Collateral under the terms of the Agreement. *See* Exhibit A.

38.     To the best of Plaintiff's knowledge, information and belief, the value of the Collateral is commensurate with principal amount of the Loan.

39.     To Plaintiff's best knowledge, information and belief, the Collateral is located at the offices of either First Capital or United Realty.

40.     The Collateral is wrongfully detained by either First Capital or United Realty.

41.     To Plaintiff's best knowledge, information and belief, either First Capital or United Realty detain this property because they have not complied with the terms of the Agreement.

42.     To Plaintiff's best knowledge, information and belief, the Collateral has not been taken for any tax, assessment or fine, pursuant to law, nor has the Collateral been taken under an execution or attachment against Plaintiff's property, and Plaintiff's cause of action has accrued within the last three (3) years.

43.     Pursuant to Ark. Code Ann. § 18-60-801, *et seq.*, Plaintiff is entitled to the immediate possession of the Collateral, and for judgment against the First Capital and United Realty in an amount to be determined at trial for any damage caused to the property or losses suffered by the Plaintiff as a result of the actions of the Defendants.

6

44.     First Capital and United Realty have been served with a *Notice of Intention to Issue Writ of Replevin.*

## COUNT III—BREACH OF CONTRACT

45.     The allegations in the preceding paragraphs are incorporated herein by reference.

46.     Plaintiff and First Capital entered into the Agreement on December 2, 2016. *See* Exhibit B.

47.     Upon default of the Loan, First Capital was required to (1) cure the Event of Default, (2) provide Plaintiff with true, complete and accurate books and records with respect to United Realty Capital Operating Partnership, LP and the OP Units, including, without limitation, a copy of the current partnership agreement of United Realty Capital Operating Partnership, LP, as amended, and its most current available financial statements, (3) provide Plaintiff with originals of all certificates evidencing any Pledged Equity Certificates, and (4) deliver to Plaintiff any future certificates relating to the Pledged Equity Certificates and any proceeds or distributions in connection therewith.

48.     Despite demand, First Capital has failed and refused to comply with the terms of the Agreement. *See* Exhibit E.

49.     As a result of the First Capital's breach of contract, Plaintiff has suffered damages in an amount to be determined at trial.

50.     Plaintiff performed its obligations under the Agreement.

51.     Pursuant to ARK. CODE ANN. § 16-22-308, Plaintiff is entitled to recover its attorney's fees for First Capital's breach of contract.

WHEREFORE, Plaintiff requests that this Court issue a Writ of Replevin directing the Defendants to immediately deliver the Collateral to Plaintiff, or that the appropriate law

enforcement agency take possession of the Collateral on behalf of the Plaintiff, or alternatively, for damages in an amount to be determined at trial due to Suneet Singal's fraud and First Capital' breach of contract, its attorney's fees, costs and all other relief to which it may be entitled, including punitive damages.

Respectfully submitted,

**CTHC HOLDINGS, LLC**

by its attorneys:

GILL RAGON OWEN, P.A.
425 West Capitol Ave., Suite 3800
Little Rock, Arkansas 72201
Telephone: (501) 376-3800
Facsimile: (501) 372-3359
mcnulty@gill-law.com
heffington@gill-law.com

By:/s/ Aaron M. Heffington
    Kelly W. McNulty, Bar No. 2005141
    Aaron M. Heffington, Bar No. 2013227

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on August 30, 2018, the foregoing was served upon the following counsel of record via the Court's CM/ECF filing system:

Jamie G. Moss and David C. Jung
WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, AR 72201
jmoss@wlj.com; djung@wlj.com

Joshua D. Brinen
BRINEN & ASSOCIATES, LLC
90 Broad Street, Second Floor
New York, New York 10004
jbrinen@brinenlaw.com

/s/ Aaron M. Heffington
Aaron M. Heffington

8

# EXHIBIT A

## LIMITED LIABILITY COMPANY RESOLUTION TO GRANT COLLATERAL

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $863,487.00 | 12-02-2016 | 12-02-2017 | | 023 | | MH | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Freedom Capital Investment Management LLC (TIN:

Freedom Capital Investment Advisors LLC (TIN:

1550 Wilson Blvd., Suite 450
Arlington, VA 22209

**Lender:** HEARTLAND Bank
Little Rock Office
One Information Way
Suite 300
Little Rock, AR 72202
(501) 663-3306

**Company:** CTHC Holdings, LLC(
PO Box 891
Bryant, AR 72089

**I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT:**

**THE COMPANY'S EXISTENCE.** The complete and correct name of the Company is CTHC Holdings, LLC ("Company"). The Company is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Arkansas. The Company is duly authorized to transact business in all other states in which the Company is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which the Company is doing business. Specifically, the Company is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. The Company has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. The Company maintains an office at PO Box 891, Bryant, AR 72089. Unless the Company has designated otherwise in writing, the principal office is the office at which the Company keeps its books and records. The Company will notify Lender prior to any change in the location of the Company's state of organization or any change in the Company's name. The Company shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to the Company and the Company's business activities.

**RESOLUTIONS ADOPTED.** At a meeting of the members of the Company, duly called and held on December 2, 2016, at which a quorum was present and voting, or by other duly authorized action in lieu of a meeting, the resolutions set forth in this Resolution were adopted.

**MANAGER.** The following named person is a manager of CTHC Holdings, LLC:

| NAMES | TITLES | AUTHORIZED | ACTUAL SIGNATURES |
|---|---|---|---|
| Richard A Williams | Manager | Y | X |

**ACTIONS AUTHORIZED.** Any one (1) of the authorized person listed above may enter into any agreements of any nature with Lender, and those agreements will bind the Company. Specifically, but without limitation, any one (1) of such authorized person is authorized, empowered, and directed to do the following for and on behalf of the Company:

**Grant Security.** To mortgage, pledge, transfer, endorse, hypothecate, or otherwise encumber and deliver to Lender any property now or hereafter belonging to the Company or in which the Company now or hereafter may have an interest, including without limitation all of the Company's real property and all of the Company's personal property (tangible or intangible), as security for the payment of any loans, any promissory notes, or any other or further indebtedness of Freedom Capital Investment Management LLC and Freedom Capital Investment Advisors LLC to Lender at any time owing, however the same may be evidenced. Such property may be mortgaged, pledged, transferred, endorsed, hypothecated or encumbered at the time such loans are obtained or such indebtedness is incurred, or at any other time or times, and may be either in addition to or in lieu of any property theretofore mortgaged, pledged, transferred, endorsed, hypothecated or encumbered. The provisions of this Resolution authorizing or relating to the pledge, mortgage, transfer, endorsement, hypothecation, granting of a security interest in, or in any way encumbering, the assets of the Company shall include, without limitation, doing so in order to lend collateral security for the indebtedness, now or hereafter existing, and of any nature whatsoever, of Freedom Capital Investment Management LLC and Freedom Capital Investment Advisors LLC to Lender. The Company has considered the value to itself of lending collateral in support of such indebtedness, and the Company represents to Lender that the Company is benefited by doing so.

**Execute Security Documents.** To execute and deliver to Lender the forms of mortgage, deed of trust, pledge agreement, hypothecation agreement, and other security agreements and financing statements which Lender may require and which shall evidence the terms and conditions under and pursuant to which such liens and encumbrances, or any of them, are given; and also to execute and deliver to Lender any other written instruments, any chattel paper, or any other collateral, of any kind or nature, which Lender may deem necessary or proper in connection with or pertaining to the giving of the liens and encumbrances. Notwithstanding the foregoing, any one of the above authorized persons may execute, deliver, or record financing statements.

**Further Acts.** To do and perform such other acts and things and to execute and deliver such other documents and agreements as the manager may in his or her discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Resolution.

**ASSUMED BUSINESS NAMES.** The Company has filed or recorded all documents or filings required by law relating to all assumed business names used by the Company. Excluding the name of the Company, the following is a complete list of all assumed business names under which the Company does business: None.

**MULTIPLE BORROWERS.** The Company may enter into transactions in which there are multiple borrowers on obligations to Lender and the Company understands and agrees that, with or without notice to the Company, Lender may discharge or release any party or collateral securing an obligation, grant any extension of time for payment, delay enforcing any rights granted to Lender, or take any other action or inaction, without the loss to Lender of any of it rights against the Company; and that Lender may modify transactions without the consent of or notice to anyone other than the party with whom the modification is made.

**NOTICES TO LENDER.** The Company will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (A) change in the Company's name; (B) change in the Company's assumed business name(s); (C) change in the management or in the Managers of the Company; (D) change in the authorized signer(s); (E) change in the Company's principal office address; (F) change in the Company's state of organization; (G) conversion of the Company to a new or different type of business entity; or (H) change in any other aspect of the Company that directly or indirectly relates to any agreements between the Company and Lender. No change in the Company's name or state of organization will take effect until after Lender has received notice.

## LIMITED LIABILITY COMPANY RESOLUTION TO GRANT COLLATERAL
### (Continued)

Loan No: ███████████                                                                    Page 2

**CERTIFICATION CONCERNING MANAGERS AND RESOLUTIONS.** The manager named above is duly elected, appointed, or employed by or for the Company, as the case may be, and occupies the position set opposite his or her respective name. This Resolution now stands of record on the books of the Company, is in full force and effect, and has not been modified or revoked in any manner whatsoever.

**CONTINUING VALIDITY.** Any and all acts authorized pursuant to this Resolution and performed prior to the passage of this Resolution are hereby ratified and approved. This Resolution shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time). Any such notice shall not affect any of the Company's agreements or commitments in effect at the time notice is given.

**IN TESTIMONY WHEREOF,** I have hereunto set my hand and attest that the signature set opposite the name listed above is his or her genuine signature.

I have read all the provisions of this Resolution, and I personally and on behalf of the Company certify that all statements and representations made in this Resolution are true and correct. This Limited Liability Company Resolution to Grant Collateral is dated December 2, 2016.

CERTIFIED TO AND ATTESTED BY:

X _____ x _____
　　　　　　　　　　　Richard A Williams, Manager of CTHC Holdings, LLC

**NOTE:** If the manager signing this Resolution is designated by the foregoing document as one of the managers authorized to act on the Company's behalf, it is advisable to have this Resolution signed by at least one non-authorized manager of the Company.

**RECORDATION REQUESTED BY:**
    HEARTLAND Bank
    Little Rock Office
    One Information Way
    Suite 300
    Little Rock, AR 72202

**WHEN RECORDED MAIL TO:**
    HEARTLAND Bank
    Little Rock Office
    One Information Way
    Suite 300
    Little Rock, AR 72202

**SEND TAX NOTICES TO:**
    HEARTLAND Bank
    Little Rock Office
    One Information Way
    Suite 300
    Little Rock, AR 72202

**FOR RECORDER'S USE ONLY**

This Mortgage prepared by:

    Name:  Paula Gwin, Sr. Loan Processor
    Company:  HEARTLAND Bank
    Address:  One Information Way, Suite 300, Little Rock, AR 72202

# MORTGAGE

**THIS MORTGAGE** dated December 2, 2016, is made and executed between CTHC Holdings, LLC (referred to below as "Grantor") and HEARTLAND Bank, whose address is One Information Way, Suite 300, Little Rock, AR 72202 (referred to below as "Lender").

**GRANT OF MORTGAGE.** For valuable consideration, Grantor grants, bargains, sells and conveys to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water and water rights; and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in Saline County, State of Arkansas:

    **See Exhibit A, which is attached to this Mortgage and made a part of this Mortgage as if fully set forth herein.**

The Real Property or its address is commonly known as  3300 Military Road, Benton, AR 72015.

Grantor absolutely and presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property.  In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

**FUTURE ADVANCES.** In addition to the Note, this Mortgage secures all future advances made by Lender to Borrower whether or not the advances are made pursuant to a commitment.  Specifically, without limitation, this Mortgage secures, in addition to the amounts specified in the Note, all future amounts Lender in its discretion may loan to Borrower, up to the time of foreclosure of this Mortgage, whether then matured or not, together with all interest thereon.

**THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE  (A)  PAYMENT OF THE INDEBTEDNESS AND  (B)  PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**GRANTOR'S WAIVERS.** Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that:  (a) this Mortgage is executed at Borrower's request and not at the request of Lender;  (b) Grantor has the full power, right, and authority to enter into this Mortgage and to hypothecate the Property;  (c) the provisions of this Mortgage do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor;  (d) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and  (e) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Borrower shall pay to Lender all Indebtedness secured by this Mortgage as it becomes due, and Borrower and Grantor shall strictly perform all Borrower's and Grantor's obligations under this Mortgage.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Borrower and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

# MORTGAGE
## (Continued)

**Possession and Use.** Until the occurrence of an Event of Default, Grantor may  (1)  remain in possession and control of the Property; (2)  use, operate or manage the Property; and  (3)  collect the Rents from the Property.

**Duty to Maintain.**  Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.**  Grantor represents and warrants to Lender that:  (1)  During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property;  (2)  Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing,  (a)  any breach or violation of any Environmental Laws,  (b)  any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or  (c)  any actual or threatened litigation or claims of any kind by any person relating to such matters; and  (3)  Except as previously disclosed to and acknowledged by Lender in writing,  (a)  neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and  (b)  any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws.  Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage.  Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person.  The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances.  Grantor hereby  (1)  releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and  (2)  agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor.  The provisions of this section of the Mortgage, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.**  Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property.  Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.**  Grantor shall not demolish or remove any improvements from the Real Property without Lender's prior written consent.  As a condition to the removal of any improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such improvements with improvements of at least equal value.

**Lender's Right to Enter.**  Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.**  Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act.  Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized.  Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.**  Grantor agrees neither to abandon or leave unattended the Property.  Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.**  Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property.  A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property.  If any Grantor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Grantor.  However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Arkansas law.

**TAXES AND LIENS.**  The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.**  Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property.  Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.**  Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized.  If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or

# MORTGAGE
## (Continued)

other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption and boiler insurance as Lender may require. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of fifteen (15) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the indebtedness. If Lender holds any proceeds after payment in full of the indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Mortgage or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Mortgage or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Mortgage also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time

## MORTGAGE
### (Continued)

to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Borrower.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Grantor's obligations under the Note, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Borrower and Grantor pay all the Indebtedness, including without limitation all future advances, when due, and Grantor otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a

# MORTGAGE
## (Continued)

suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Mortgage:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Default on Other Payments.** Failure of Grantor within the time required by this Mortgage to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's ability to repay the Indebtedness or Borrower's or Grantor's ability to perform their respective obligations under this Mortgage or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Mortgage or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Mortgage or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution of Grantor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Borrower's or Grantor's existence as a going business or the death of any member, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Borrower or Grantor under the terms of any other agreement between Borrower or Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Borrower or Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Mortgage within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Borrower or Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty that Borrower would be required to pay.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Borrower or Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with

## MORTGAGE
### (Continued)

the power to protect and preserve the Property, to operate the Property proceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Nonjudicial Sale.** If permitted by applicable law, Lender may foreclose Grantor's interest in all or in any part of the Personal Property or the Real Property by non-judicial sale.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Borrower or Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Note or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Grantor hereby waive any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Mortgage, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies. Nothing under this Mortgage or otherwise shall be construed so as to limit or restrict the rights and remedies available to Lender following an Event of Default, or in any way to limit or restrict the rights and ability of Lender to proceed directly against Grantor and/or Borrower and/or against any other co-maker, guarantor, surety or endorser and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any party may change its address for notices under this Mortgage by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law.** This Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Arkansas without regard to its conflicts of law provisions. This Mortgage has been accepted by Lender in the State of Arkansas.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Grantor signing below is responsible for all obligations in this Mortgage. Where any one or more of the parties is a corporation,

# MORTGAGE
## (Continued)

partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Mortgage.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Mortgage unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Mortgage shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Mortgage. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Mortgage. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Mortgage shall not affect the legality, validity or enforceability of any other provision of this Mortgage.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waiver of Homestead Exemption and Other Rights.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Arkansas as to all Indebtedness secured by this Mortgage, waives all rights of appraisement, sale and redemption under the laws of Arkansas, including the Act of the General Assembly of Arkansas dated May 8, 1899 and Acts amendatory thereof, and, if applicable, waives all claims of dower or curtesy.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Freedom Capital Investment Management LLC and Freedom Capital Investment Advisors LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Default.** The word "Default" means the Default set forth in this Mortgage in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Grantor.** The word "Grantor" means CTHC Holdings, LLC.

**Guaranty.** The word "Guaranty" means the guaranty from guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision of this Mortgage, together with all interest thereon.

**Lender.** The word "Lender" means HEARTLAND Bank, its successors and assigns.

## MORTGAGE
### (Continued)

Mortgage. The word "Mortgage" means this Mortgage between Grantor and Lender.

Note. The word "Note" means the promissory note dated December 2, 2016, in the original principal amount of $863,487.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The maturity date of the Note is December 2, 2017.

Personal Property. The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

Property. The word "Property" means collectively the Real Property and the Personal Property.

Real Property. The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

Rents. The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.

GRANTOR:

CTHC HOLDINGS, LLC

By: _____
Richard A Williams, Manager of CTHC Holdings, LLC

---

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE OF _Arkansas_

COUNTY OF _Garland_                    ) SS

On this _13th_ day of _December_, 20 _16_, before me, _Sandra Marshall Cain_ a Notary Public, (or before any officer within this State or without the State now qualified under existing law to take acknowledgments), duly commissioned, qualified and acting, within and for said County and State, appeared in person the within named Richard A Williams, (being the person or persons authorized by said limited liability company to execute such instrument, stating their respective capacities in that behalf), to me personally well known for satisfactorily proven to be such person), who stated that he or she was the Manager of CTHC Holdings, LLC, a limited liability company, and was duly authorized in his or her respective capacities to execute the foregoing instrument(s) for and in the name and behalf of said limited liability company, and further stated and acknowledged that he or she had so signed, executed, and delivered said foregoing instrument for the consideration, uses, and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _13th_ day of _December_ , 20 _16_.

By _Sandra Marshall Cain_                    Residing at _____

Notary Public in and for the State of _____    My commission expires _EXP 1-16-2017_

# EXHIBIT B

### PLEDGE AND SECURITY AGREEMENT

THIS **PLEDGE AND SECURITY AGREEMENT** is entered into as of December 2, 2016 by and between **First Capital Real Estate Investments, LLC** ("*Grantor*") and **CTHC Holdings, LLC** ("*Collateral Support Provider*"), on behalf of its Affiliates, participants and assigns ("*Collateral Support Provider*").

### R E C I T A L S

WHEREAS, Heartland Bank ("Lender") made a loan dated December 2, 2016 in the principal amount of $863,487 (the "Loan") to Freedom Capital Investment Advisors LLC and Freedom Capital Investment Management LLC (collectively, "Borrowers"); and

WHEREAS, Collateral Support Provider provided a mortgage upon certain real property in Saline County, Arkansas (the "Mortgaged Property") as collateral for the Loan (the "Mortgage"); and

WHEREAS, Grantor gained benefit from the Loan and is entering into this Pledge and Security Agreement (as it may be amended, restated or modified from time to time, this "*Agreement*") in order to, among other things, provide security to Collateral Support Provider.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and to induce Collateral Support Provider to provide the Mortgage to secure the Loan, the parties hereby agree as follows:

## 1.   DEFINITIONS

1.1.   **Reference to Pledge Agreement.** Unless otherwise specified, all references herein to Articles, Sections, Preliminary Statements, Exhibits, and Schedules refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, this Agreement. All Exhibits and Schedules shall be deemed a part of this Agreement. All Schedules include amendments and supplements thereto from time to time.

1.2.   **Principles of Construction.** Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neutral, as the context indicates is appropriate. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". All references to agreements and other contractual instruments shall be deemed to include subsequent amendments, permitted assignments and other modifications thereto, but only to the extent such amendments, assignments and other modifications are not prohibited by the terms of any Loan Document. Furthermore, any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time.

1.3.   **Definitions.**   Unless otherwise defined herein, or the context hereof otherwise requires, each term defined in either of the Notes or in the UCC is used in this Agreement with the same meaning; *provided that*, if the definition given to such term in the Notes conflicts with the definition given to such term in the UCC, the Notes definition shall control to the extent legally allowable; and if any definition given to such term in Article 9 of the UCC conflicts with the definition given to such term in any other chapter of the UCC, the Article 9 definition shall prevail. All definitions herein shall be equally applicable to both the singular and plural forms of the defined terms. As used herein, the following terms have the meanings indicated:

"*Collateral*" shall have the meaning set forth in *Section 2.1*.

"*Grantor*" has the meaning set forth in the introductory paragraph of this Agreement and includes Grantor' successors and assigns.

"*Instrument*" means any "*instrument*", as such term is defined in *Section 9.102(a)(47)* of the UCC.

"*Loan Documents*" means any of the notes, security agreements, mortgages, deeds of trust, credit agreements and other certificates, agreements and instruments relating to the Loans.

"*Material Adverse Event*" means an event that would prevent Grantor from performing its duties under this Agreement.

"*Pledged Equity Interests*" means all of those certain 466,565 OP Units and equity ownership and stock interests in United Realty Capital Operating Partnership, LP, and its successors in interest, as well as all accruals, conversion rights and all dividends, other distributions, cash, warrants, rights, options, instruments, securities and other property or other Proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such limited liability company interests.

"*Proceeds*" means any "*proceeds*," as such term is defined in *Section 9-102(a)(64)* of the UCC, and, in any event, shall include, but not be limited to, (a) any and all dividends and distributions with respect to any of the Pledged Equity Interests, (b) proceeds of any insurance, indemnity, warranty, or guaranty payable to Grantor from time to time with respect to any of the Pledged Equity Interests, (c) any and all payments (in any form whatsoever) made or due and payable to Grantor from time to time in connection with any requisition, confiscation, condemnation, seizure, or forfeiture of all or any part of the Pledged Equity Interests by any Governmental Authority (or any person acting under color of Governmental Authority), and (d) any and all other amounts from time to time paid or payable under or in connection with any of the Pledged Equity Interests.

"*Section*" means a numbered Section of this Agreement, unless another document is specifically referenced.

"*Security*" has the meaning set forth in *Section 8-102(a)(15)* of the UCC.

"*Security Interests*" means the pledge and security interests in (a) the pledge and security interest in the Collateral granted in this Agreement, and (b) all other security interests created or

assigned as additional security for the Collateral Support Provider pursuant to the provisions of this Agreement.

"*Specified Stock Rights*" means any equity interests, securities, dividends or other distributions and any other right or property which Grantor shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for the Pledged Equity Interests.

"*UCC*" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of Arkansas; provided, however, that in any event, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority (or terms of similar import in any applicable jurisdiction) of Collateral Support Provider's Security Interest in any Collateral is governed by the UCC (or other similar law) as in effect in a jurisdiction (whether within or outside the United States) other than the State of Arkansas, the term "UCC" shall mean the Uniform Commercial Code (or other similar law) as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority (or terms of similar import in such jurisdiction) and for purposes of definitions related to such provisions.

2.     **GRANT OF SECURITY INTEREST**

2.1.     **Grant of Security Interest.**

(a)     As collateral security for the Collateral Support Provider to provide the Mortgage, Grantor hereby pledges and grants to Collateral Support Provider (including its Affiliates), a second priority Lien on and security interest in and to, and agrees and acknowledges that Collateral Support Provider has and shall continue to have, a Security Interest in and to, all of Grantor' right, title and interest in and to the Pledged Equity Interests and all Proceeds of the Pledged Equity (all of the property being described in the preceding clauses the "*Collateral*"), whether now owned or hereafter acquired, wherever located, howsoever arising or created and whether now existing or hereafter arising, existing or created; subordinate to the prior lien of Lender.

(b)     The Security Interests are granted as security only and shall not subject Collateral Support Provider or any holder of the Secured Obligations to, or transfer or in any way modify, any Obligations or liability of Grantor with respect to any of the Collateral.

2.2.     **Grantor Remain Liable.** Notwithstanding anything to the contrary contained herein, (a) Grantor shall remain liable under the contracts and agreements included in the Collateral, to the extent set forth therein to perform all of its respective duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by Collateral Support Provider of any of its rights hereunder shall not release Grantor from any of their duties or obligations under the contracts and agreements included in the Collateral, and (c) Collateral Support Provider shall not have any obligations or liability under any of the contracts and agreements included in the Collateral by reason of this Agreement, nor shall Collateral Support Provider be obligated to perform any of the obligations or duties of Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

2.3.   **Authorization to File Financing Statements.**   Grantor hereby irrevocably authorize Collateral Support Provider at any time and from time to time to file in any UCC jurisdiction any initial financing statements and amendments thereto that describe the Collateral and contain any other information required by Part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including whether Grantor are an organization, the type of organization and any organization identification number issued to Grantor.  Grantor agree to furnish any such information to Collateral Support Provider promptly upon request.

3.   **REPRESENTATIONS AND WARRANTIES.**   Grantor represents and warrants to Collateral Support Provider that:

3.1.   **Title, Authorization, Validity and Enforceability.**   Grantor has good and valid rights in and title to the Collateral with respect to which it has purported to grant a Security Interest hereunder, free and clear of all other Liens, and has full power and authority to grant to Collateral Support Provider the Security Interest in such Collateral pursuant hereto.   The execution and delivery by Grantor of this Agreement is duly authorized, and this Agreement constitutes a legal, valid and binding obligation of Grantor and creates a Security Interest which is enforceable against Grantor in all now owned and hereafter acquired Collateral.   When financing statements have been filed in the appropriate offices against Grantor in the locations listed on *Exhibit B*, Collateral Support Provider will have a fully perfected first priority Security Interest in that Collateral in which a Security Interest may be perfected by filing, subject to no other Liens.

3.2.   **Conflicting Laws and Contracts.**   Neither the execution and delivery by Grantor of this Agreement, the creation and perfection of the Security Interest in the Collateral granted hereunder, nor compliance with the terms and provisions hereof will violate any law, rule, regulation, order, writ, judgment, injunction, decree or award binding on Grantor or Grantor' articles or certificate of incorporation, bylaws, articles of organization or operating agreement or other charter documents, as the case may be, the provisions of any indenture, instrument or agreement to which Grantor are a party or are subject, or by which they, or their property, is bound, or conflict with or constitute a default thereunder, or result in the creation or imposition of any Lien pursuant to the terms of any such indenture, instrument or agreement (other than any Lien of Collateral Support Provider).

3.3.   **Reserved.**

3.4.   **Litigation.**   There is no litigation investigation or governmental proceeding threatened against Grantor or any of their properties which would reasonably be expected to result in a Material Adverse Event with respect to the Collateral or Grantor.

3.5.   **No Other Names.**   Grantor has not conducted business under any name except the name in which it has executed this Agreement.

3.6.   **No Default or Event of Default.**   No Default or Event of Default has occurred.

3.7.   **No Financing Statements.**   No financing statement describing all or any portion of the Collateral which has not lapsed or been terminated naming Grantor as debtors has been

filed in any jurisdiction except (a) financing statements naming Lender and Collateral Support Provider as the Collateral Support Provider, and (b) as permitted by *Section 4.1(d)*.

3.8.   **Pledged Equity Interests.** *Exhibit A* sets forth a true, correct, and complete list of the Pledged Equity Interests. Grantor is the direct and beneficial owner of the Pledged Equity Interests free and clear of any Liens, except for the security interest granted to Collateral Support Provider hereunder. Grantor further represents and warrants that (a) all Pledged Equity Interests are duly and validly issued, are fully paid and non-assessable and (b) while the Pledged Equity Interests are certificated pursuant to the terms of the LLC Agreements of Retail, Builders or Management they are not Securities as defined in Article 8 of the UCC of the applicable jurisdiction and Grantor will provide Collateral Support Provider with advance written notice if Retail, Builders or Management ever elects to be governed by the provisions of Article 8 of the UCC and immediately deliver to Collateral Support Provider any and all certificates issued to represent such securities.

4.   **COVENANTS.** From the date of this Agreement, and thereafter until this Agreement is terminated:

4.1.   **General.**

(a)   **Inspection.** Grantor will permit Collateral Support Provider, by its representatives and agents (i) to inspect the Collateral, (ii) to examine and make copies of the records of Grantor relating to the Collateral and (iii) to discuss the Collateral and the related records of Grantor with, and to be advised as to the same by, Grantor' officers, employees, and accountants all at such reasonable times and intervals as Collateral Support Provider may determine, and all at Grantor' expense.

(b)   **Taxes.** Grantor will pay when due all taxes, assessments and governmental charges and levies upon the Collateral, except those which are being contested in good faith by appropriate proceedings and with respect to which no Lien exists and as to which appropriate reserves are being maintained.

(c)   **Records and Reports; Notification of a Default and Event of Default.** Grantor will maintain true, complete, and accurate books and records with respect to the Collateral, and furnish to Collateral Support Provider such reports relating to the Collateral at such intervals as Collateral Support Provider shall from time to time reasonably request. Grantor will, upon becoming aware thereof, give prompt notice in writing to Collateral Support Provider of the occurrence of any Default or Event of Default and of any other development, financial or otherwise, which would reasonably be expected to materially and adversely affect the Collateral. Grantor shall mark their books and records to reflect the Security Interest of Collateral Support Provider under this Agreement.

(d)   **Financing Statements and Other Actions; Defense of Title.** Grantor will deliver to Collateral Support Provider all financing statements and deliver to the Collateral Support Provider the originals of all certificates evidencing any of the Pledged Equity Interests and take such other actions as may from time to time be reasonably

5

requested by Collateral Support Provider in order to maintain a first perfected Security Interest in the Collateral and/or to otherwise enable the Collateral Support Provider to enjoy its interest, rights and remedies under this Agreement. Grantor will take any and all actions necessary to defend title to the Collateral against all persons and to defend the Security Interest of Collateral Support Provider in the Collateral and the priority thereof against any Lien not expressly permitted hereunder.

(e)     **Disposition of Collateral.** Grantor will not sell, lease or otherwise dispose of the Collateral or transfer or convey any assets of Retail, Builders or Management or any subsidiaries or affiliates except as permitted under the Loan Documents.

(f)     **Liens.** Grantor will not create, incur, or suffer to exist any Lien on the Collateral except the Security Interest created by this Agreement.

(g)     **Change in Location, Jurisdiction of Organization or Name.** Grantor will not (a) maintain a place of business at a location other than a location specified on *Exhibit D*, (b) change their name or taxpayer identification number, (c) change their mailing address, or (d) change their jurisdiction of organization, unless in each case Grantor shall have given Collateral Support Provider not less than thirty (30) days' prior written notice thereof, and Collateral Support Provider shall have reasonably determined that such change will not adversely affect the validity, perfection or priority of Collateral Support Provider's Security Interest in the Collateral. Prior to making any of the foregoing changes, Grantor shall execute and deliver all such additional documents and perform all additional acts as Collateral Support Provider, in its sole discretion, may request in order to continue or maintain the existence and priority of its Security Interest in all of the Collateral.

(h)     **Other Financing Statements.** Grantor will not sign or authorize the signing on their behalf of any financing statement naming it as debtor covering all or any portion of the Collateral, except for financing statements naming the Collateral Support Provider as Collateral Support Provider.

4.2.     **Securities.** Grantor will (a) deliver to Collateral Support Provider immediately upon execution of this Agreement the originals of all certificates evidencing any Collateral, (b) hold in trust for Collateral Support Provider upon receipt and immediately thereafter deliver to Collateral Support Provider any future certificates evidencing Collateral or any accruals or rights associated therewith, and (c) upon Collateral Support Provider's request, deliver to Collateral Support Provider (and thereafter hold in trust for Collateral Support Provider upon receipt and immediately deliver to Collateral Support Provider) any other document evidencing or constituting Collateral.

4.3.     **Stock, Pledged Equity Interests, and Other Ownership Interests.**

(a)     **Issuance of Securities.** Grantor shall not permit any Pledged Equity Interest to at any time constitute a Security or consent to the issue of any such interests taking any action to have such interests treated as a Security unless (i) all certificates or

other documents constituting such Security have been delivered to Collateral Support Provider and such Security is properly defined as such under Article 8 of the UCC of the applicable jurisdiction, whether as a result of actions by the issuer thereof or otherwise, or (ii) Collateral Support Provider has entered into a control agreement with the issuer of such Security or with a securities intermediary relating to such Security and such Security is defined as such under Article 8 of the UCC of the applicable jurisdiction, whether as a result of actions by the issuer thereof or otherwise.

4.4. **Compliance with Agreements.** Grantor shall comply in all material respects with all mortgages, deeds of trust, instruments, and other agreements binding on it or affecting their properties or business.

4.5. **Compliance with Laws.** Grantor shall comply, in all material respects, with all applicable laws, rules, regulations, and orders of any court or Governmental Authority.

4.6. **Further Assurances.** At any time and from time to time, upon the request of Collateral Support Provider, and at the sole expense of Grantor, Grantor shall promptly execute and deliver all such further instruments and documents and take such further action as Collateral Support Provider may deem reasonably necessary or desirable (a) to assure Collateral Support Provider that its Security Interests hereunder are perfected with a first priority Lien and (b) to carry out the provisions and purposes of this Agreement, including (i) the filing of such financing statements as Collateral Support Provider may require, (ii) furnishing to the Collateral Support Provider from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Collateral Support Provider may reasonably request, all in reasonable detail, and (iii) taking all actions required by law in any relevant UCC, or by other law as applicable in any foreign jurisdiction. Grantor shall promptly endorse and deliver to Collateral Support Provider all documents, instruments, and chattel paper that it now owns or may hereafter acquire with respect to the Collateral.

5. **EVENTS OF DEFAULT**

5.1. **Remedies.** Upon the occurrence and during the continuance of an Event of Default under the Loans or any other Loan Document, Collateral Support Provider may exercise any or all of the following rights and remedies:

(a)     Those rights and remedies provided in this Agreement, the Notes, or any other Loan Document.

(b)     Those rights and remedies available to a Collateral Support Provider under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable law (including any law governing the exercise of a bank's right of setoff or bankers' lien) when a Grantor are in default under a security agreement.

(c)     Without notice except as specifically provided in *Section 8.1* or elsewhere herein, sell, lease, assign, grant an option or options to purchase or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, for cash, on credit or for future delivery, and upon such other terms as Collateral Support Provider may deem commercially reasonable. Neither Collateral Support Provider's compliance

with any applicable state or federal law in the conduct of such sale, nor its disclaimer of any warranties relating to the Collateral, shall be considered to affect the commercial reasonableness of such sale.

(d)    During the existence of any Event of Default, all payments and distributions made on behalf of Grantor's Specified Stock Rights shall be paid or delivered to Collateral Support Provider (except that if the Collateral Support Provider has not taken any other material enforcement action upon written consent of Collateral Support Provider, the Grantor may receive Tax Distributions (as defined in the LLC Agreements of Retail, Builders and Management) and distribute same as "Tax Distributions" under the Loans, and Grantor agrees to take all such action as Collateral Support Provider may deem necessary or appropriate to cause all such payments and distributions to be made to Collateral Support Provider. Further, Collateral Support Provider shall have the right, during the existence of any Event of Default, to notify and direct Retail, Builders and Management (subject as aforesaid with respect to Tax Distributions) to make all payments, dividends, and any other distributions payable in respect thereof directly to Collateral Support Provider. Retail, Builders and Management shall be fully protected in relying on the written statement of Collateral Support Provider that it then holds a Security Interest which entitles it to receive such payments and distributions.  Any and all money and other property paid over to or received by Collateral Support Provider hereunder shall be retained by as additional Collateral hereunder or applied to the Obligations.

(e)    Grantor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (collectively, the "*Securities Act*") and applicable state securities laws, Collateral Support Provider may be compelled, with respect to any sale of all or any part of the Collateral conducted without prior registration or qualification of such Collateral under the Securities Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Grantor acknowledge that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the Securities Act) and, notwithstanding such circumstances, Grantor agree that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Collateral Support Provider shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.  If Collateral Support Provider determines to exercise its right to sell any or all of the Collateral, upon written request, Grantor shall furnish to Collateral Support Provider all such information as Collateral Support Provider may request in order to determine the number and nature of interest, shares or other instruments included in the Collateral which may be sold by Collateral Support Provider in exempt transactions under the Securities Act and the rules and regulations of the Securities and Exchange Commission thereunder, as the same are from time to time in effect. In case of any sale of all or any

part of the Collateral on credit or for future delivery, such Collateral so sold may be retained by Collateral Support Provider until the selling price is paid by the purchaser thereof, but the Collateral Support Provider shall not incur any liability in case of the failure of such purchaser to take up and pay for such assets so sold and in case of any such failure, such Collateral may again be sold upon like notice. Collateral Support Provider, instead of exercising the power of sale herein conferred upon them, may proceed by a suit or suits at law or in equity to foreclose Security Interests created hereunder and sell such Investment Property, or any portion thereof, under a judgment or decree of a court or courts of competent jurisdiction.

(f)     If Collateral Support Provider sells any of the Collateral upon credit, Grantor will be credited only with payments actually made by the purchaser, received by Collateral Support Provider, and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, Collateral Support Provider may resell the Collateral and Grantor shall be credited with the Proceeds of the sale.

5.2.     **Cure.**  Grantor shall have ten (10) days following the occurrence of any Event of Default to cure such Default; provided, however, if the Default is capable of being cured but not within ten (10) days, Grantor shall have thirty (30) days to cure such Default.

6.     **WAIVERS, AMENDMENTS AND REMEDIES.**  No delay or omission of Collateral Support Provider to exercise any right or remedy granted under this Agreement shall impair such right or remedy or be construed to be a waiver of any Event of Default, or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy.  No waiver, amendment or other variation of the terms, conditions or provisions of this Agreement whatsoever shall be valid unless in writing signed by Collateral Support Provider and then only to the extent in such writing specifically set forth.  All rights and remedies contained in this Agreement or by law afforded shall be cumulative and all shall be available to Collateral Support Provider until this Agreement has been terminated pursuant to *Section 8.11.*

7.     **PROCEEDS**

7.1.     **Application of Proceeds.** Upon the occurrence and during the continuation of an Event of Default, the Proceeds of the Collateral may be applied by Collateral Support Provider to payment of the Secured Obligations in such manner and order as Collateral Support Provider may elect in its sole discretion.

8.     **GENERAL PROVISIONS**

8.1.     **Notice of Disposition of Collateral.**  Grantor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made.  To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to Grantor, addressed as set forth in *Section 9.1,* at least ten (10) days prior to (a) the date of any such public sale or (b) the time after which any such private sale or other disposition may be made. Collateral Support Provider shall not be obligated to make any sale or other disposition of the Collateral regardless of

notice having been given. Subject to the provisions of applicable law, Collateral Support Provider may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, to the extent permitted by law, be made at the time and place to which the sale was postponed, or Collateral Support Provider may further postpone such sale by announcement made at such time and place.

8.2.    **Collateral Support Provider Performance of Grantor' Obligations.** Without having any obligation to do so, Collateral Support Provider may perform or pay any Obligations which Grantor have agreed to perform or pay in this Agreement, and Grantor shall reimburse Collateral Support Provider for any amounts paid by Collateral Support Provider pursuant to this *Section 8.2.* Grantor' obligations to reimburse Collateral Support Provider pursuant to the preceding sentence shall be a Secured Obligation payable on demand.

8.3.    **Authorization for Collateral Support Provider to Take Certain Action.** Grantor irrevocably authorize Collateral Support Provider at any time and from time to time in the sole discretion of Collateral Support Provider, and appoints Collateral Support Provider as its attorney in fact, coupled with an interest, (a) to execute on behalf of Grantor as debtors and to file financing statements necessary or desirable in Collateral Support Provider's sole discretion to perfect and to maintain the perfection and priority of Collateral Support Provider's Security Interest in the Collateral, (b) during the existence of any Event of Default, to indorse and collect any cash Proceeds of the Collateral, (c) to apply the Proceeds of any Collateral received by Collateral Support Provider to the Secured Obligations as provided in *Section 7* and (d) to discharge past due taxes, assessments, charges, fees or Liens on the Collateral (except for such Liens as are specifically permitted hereunder), and Grantor agree to reimburse Collateral Support Provider on demand for any payment made or any expense incurred by Collateral Support Provider in connection therewith, *provided that* this authorization shall not relieve Grantor of any of their obligations under this Agreement or under the Notes.

8.4.    **Specific Performance of Certain Covenants.** Grantor acknowledges and agrees that a breach of any of the covenants contained in *Sections 4.1(d), 4.1(f), 4.2,* or *8.7* or in *Section 7* will cause irreparable injury to Collateral Support Provider, that Collateral Support Provider has no adequate remedy at law in respect of such breaches and therefore agrees, without limiting the right of Collateral Support Provider to seek and obtain specific performance of other Obligations of Grantor contained in this Agreement, that the covenants of Grantor contained in the Sections referred to in this *Section 8.4* shall be specifically enforceable against Grantor.

8.5.    **Reserved.**

8.6.    **Dispositions Not Authorized.** Grantor are not authorized to sell or otherwise dispose of the Collateral, except for dispositions permitted under the Notes, and notwithstanding any course of dealing between Grantor and Collateral Support Provider or other conduct of Collateral Support Provider, no authorization to sell or otherwise dispose of the Collateral (except as permitted under the Notes) shall be binding upon Collateral Support Provider unless such authorization is in writing signed by Collateral Support Provider.

8.7. **Benefit of Agreement.** The terms and provisions of this Agreement shall be binding upon and inure to the benefit of Grantor, Collateral Support Provider and their respective successors and assigns, except that Grantor shall not have the right to assign their rights or delegate their Obligations under this Agreement or any interest herein, without the prior written consent of Collateral Support Provider.

8.8. **Survival of Representations.** All representations and warranties of Grantor contained in this Agreement shall survive the execution and delivery of this Agreement.

8.9. **Taxes and Expenses.** Any taxes (including income taxes) payable or ruled payable by Federal or State authority in respect of this Agreement shall be paid by Grantor, together with interest and penalties, if any. Grantor shall reimburse Collateral Support Provider for any and all out-of-pocket expenses and internal charges (including reasonable attorneys', auditors' and accountants' fees) paid or incurred by Collateral Support Provider in connection with the preparation, execution, delivery, and administration of this Agreement and in the audit, analysis, administration, collection, preservation or sale of the Collateral (including the expenses and charges associated with any periodic or special audit of the Collateral). In addition, Grantor shall be obligated to pay all of the costs and expenses incurred by Collateral Support Provider, including attorneys' fees and court costs, in obtaining or liquidating the Collateral, in enforcing payment of the Secured Obligations, or in the prosecution or defense of any action or proceeding by or against Collateral Support Provider or Grantor concerning any matter arising out of or connected with this Agreement, any Collateral or the Secured Obligations, including any of the foregoing arising in, arising under or related to a case under any bankruptcy, insolvency or similar law. Any and all costs and expenses incurred by Grantor in the performance of actions required pursuant to the terms hereof shall be borne solely by Grantor.

8.10. **Headings.** The title of and Section headings in this Agreement are for convenience of reference only, and shall not govern the interpretation of any of the terms and provisions of this Agreement.

8.11. **Termination.** This Agreement shall continue in effect (notwithstanding the fact that from time to time there may be no Secured Obligations outstanding) until (a) the Notes has terminated pursuant to its express terms and (b) all of the Secured Obligations (except Secured Obligations consisting of contingent indemnification provisions for which no claim has been asserted) have been paid in full in cash in full and no commitments of Collateral Support Provider which would give rise to any Secured Obligations are outstanding; *provided that* any termination of this Agreement under this *Section 8.11* is subject to *Section 8.18*. Upon any such termination, the Collateral Support Provider shall (i) return any original certificates evidencing the Pledged Equity Interests previously delivered by the Grantor to the Collateral Support Provider, (ii) authorize, at the expense of the Grantor, UCC-3 termination statements to be filed terminating financing statements filed to perfect the Security Interests and (iii) at the expense of the Grantor, take such other actions as the Grantor may reasonably request to reflect such termination.

8.12. **FINAL AGREEMENT.** THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR

11

SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

8.13.   **CHOICE OF LAW.**  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF ARKANSAS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO FEDERALLY INSURED FINANCIAL INSTITUTIONS.

8.14.   **INDEMNITY.**  GRANTOR DOES HEREBY ASSUME ALL LIABILITY FOR THE MORTGAGE, THE MORTGAGED PROPERTY AND THE COLLATERAL, FOR THE SECURITY INTEREST OF COLLATERAL SUPPORT PROVIDER, AND FOR ANY USE, POSSESSION, MAINTENANCE, AND MANAGEMENT OF, ALL OR ANY OF THE COLLATERAL OR THE MORTGAGED PROPERTY, INCLUDING ANY TAXES ARISING AS A RESULT OF, OR IN CONNECTION WITH, THE TRANSACTIONS CONTEMPLATED HEREIN OR OTHERWISE RELATING TO THE MORTGAGED PROPERTY, AND AGREES TO ASSUME LIABILITY FOR, AND TO INDEMNIFY AND HOLD COLLATERAL SUPPORT PROVIDER AND ITS RESPECTIVE SUCCESSORS, ASSIGNS, AGENTS, ATTORNEYS, AND EMPLOYEES HARMLESS FROM AND AGAINST, ANY AND ALL CLAIMS, CAUSES OF ACTION, OR LIABILITY, FOR INJURIES TO OR DEATHS OF PERSONS AND DAMAGE TO PROPERTY, HOWSOEVER ARISING FROM OR INCIDENT TO SUCH USE, POSSESSION, MAINTENANCE, AND MANAGEMENT, WHETHER SUCH PERSONS BE AGENTS OR EMPLOYEES OF GRANTOR OR OF THIRD PARTIES, OR SUCH DAMAGE BE TO PROPERTY OF GRANTOR OR OF OTHERS.  GRANTOR DOES HEREBY INDEMNIFY, SAVE, AND HOLD COLLATERAL SUPPORT PROVIDER AND ITS RESPECTIVE SUCCESSORS, ASSIGNS, AGENTS, ATTORNEYS, AND EMPLOYEES HARMLESS FROM AND AGAINST, AND COVENANTS TO DEFEND COLLATERAL SUPPORT PROVIDER AGAINST, ANY AND ALL LOSSES, DAMAGES, CLAIMS, COSTS, PENALTIES, LIABILITIES, AND EXPENSES (COLLECTIVELY, *"CLAIMS"*), INCLUDING COURT COSTS AND ATTORNEYS' FEES, AND ANY OF THE FOREGOING ARISING FROM ANY ACT OR OMISSION OF COLLATERAL SUPPORT PROVIDER OR ANY OF THEIR RESPECTIVE OFFICERS, EMPLOYEES, AGENTS, ADVISORS, EMPLOYEES, OR REPRESENTATIVES AND RELATING TO THE COLLATERAL, THE MORTGAGE OR THE MORTGAGED PROPERTY HOWSOEVER ARISING OR INCURRED BECAUSE OF, INCIDENT TO, OR WITH RESPECT TO COLLATERAL, THE MORTGAGED PROPERTY OR ANY USE, POSSESSION, MAINTENANCE, OR MANAGEMENT THEREOF; *PROVIDED, HOWEVER,* THAT THE INDEMNITY SET FORTH IN THIS *SECTION 8.14* WILL NOT APPLY TO CLAIMS CAUSED BY THE WILLFUL MISCONDUCT OF COLLATERAL SUPPORT PROVIDER OR ANY OF THEIR RESPECTIVE OFFICERS, EMPLOYEES, AGENTS, ADVISORS, EMPLOYEES, OR REPRESENTATIVES, AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN FINAL AND NONAPPEALABLE JUDGMENT.

8.15.   **Limitation of Obligations.**

(a)     The provisions of this Agreement are severable, and in any action or proceeding involving any applicable law affecting the rights of creditors generally, if the

12

Obligations of Grantor under this Agreement would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of Grantor' liability under this Agreement, then, notwithstanding any other provision of this Agreement to the contrary, the amount of such liability shall, without any further action by Grantor or Collateral Support Provider, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being Grantor' "*Maximum Liability*").

(b)     Notwithstanding any or all of the Secured Obligations becoming unenforceable against Grantor or the determination that any or all of the Secured Obligations shall have become discharged, disallowed, invalid, illegal, void or otherwise unenforceable as against Grantor (whether by operation of any present or future law or by order of any court or governmental agency), the Secured Obligations shall, for the purposes of this Agreement, continue to be outstanding and in full force and effect.

**8.16.   Reserved.**

**8.17.   Reserved.**

**8.18.   Recovered Payments.**  The Secured Obligations shall be deemed not to have been paid, observed or performed, and the Grantor' obligations under this Agreement in respect thereof shall continue and not be discharged, to the extent that any payment, observance or performance thereof by Grantor are recovered from or paid over by or for the account of Collateral Support Provider for any reason, including as a preference or fraudulent transfer or by virtue of any subordination (whether present or future or contractual or otherwise) of the Secured Obligations, whether such recovery or payment over is effected by any judgment, decree or order of any court or governmental agency, by any plan of reorganization or by settlement or compromise by Collateral Support Provider (whether or not consented to by Grantor) of any claim for any such recovery or payment over. Grantor hereby expressly waive the benefit of any applicable statute of limitations and agrees that it shall be liable hereunder whenever such a recovery or payment over occurs.

## 9.     NOTICES

**9.1.     Sending Notices.**  Whenever any notice is required or permitted to be given under the terms of this Agreement, the same shall, except as otherwise expressly provided for in this Agreement, be given in writing, and sent by: (a) certified mail, return receipt requested, postage pre-paid; (b) a national overnight delivery service; (c) hand delivery with written receipt acknowledged; or (d) facsimile, followed by a copy sent in accordance with *clause (b)* or *(c)* of this *Section 9.1* sent the same day as the facsimile, in each case to the address or facsimile number (together with a contemporaneous copy to each copied addressee), as applicable, set forth in *Exhibit D*. Grantor and Collateral Support Provider shall not conduct communications contemplated by this Agreement by electronic mail or other electronic means, except by facsimile transmission as expressly provided in this *Section 9.1*, and the use of the phrase "in writing" or the word "written" shall not be construed to include electronic communications except by facsimile transmissions as expressly provided in this *Section 9.1*. Any notice required or given hereunder shall be deemed received the same Business Day if sent by hand delivery or

facsimile, the next Business Day if sent by overnight courier, or three (3) Business Days after posting if sent by certified mail, return receipt requested; *provided that* any notice received after 5:00 p.m. Dallas, Arkansas time on any Business Day or received on any day that is not a Business Day shall be deemed to have been received on the following Business Day.

9.2.    **Change in Address for Notices.**  Grantor and Collateral Support Provider may change the address for service of notice upon it by a notice in writing to the other parties.

9.3    **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any signature delivered by a party to this Agreement by facsimile or other form of electronic transmission shall be deemed to be an original signature hereto.

14

IN WITNESS WHEREOF, Grantor and Collateral Support Provider have executed this Agreement as of the date first above written.

**GRANTOR:**

**FIRST CAPITAL REAL ESTATE INVESTMENTS, LLC**

By: _____
Suneet Singal, Manager

**COLLATERAL SUPPORT PROVIDER:**
**CTHC Holdings, LLC**

By: _____

Date: _____, 2016

MWDOCS 2992840v.5

## EXHIBIT A

### List of Pledged Equity Interests

| Issuer | Certificate Number(s) | Number of Units |
| --- | --- | --- |
| United Realty Capital Operating Partnership, LP | UROP-100107 | 466,565 |

## EXHIBIT B

### UCC Filing Jurisdictions

| Grantor | Jurisdiction |
|---|---|
| First Capital Real Estate Investments, LLC | California |
| | |
| | |

## EXHIBIT C

### Federal Employer Identification Number

| Grantor | Federal Employer Identification Number |
|---|---|
| First Capital Real Estate Investments, LLC | ▇▇▇▇▇▇▇ |

**EXHIBIT D**

<u>Principal Place of Business and Mailing Address</u>:

<u>Attention</u>:

Suneet Singal
2377 Gold Meadow Way, Ste. 100
Gold River, CA 95670



# EXHIBIT C

**SECRETARY OF STATE**

**STATE OF CALIFORNIA**

**UCC Filing Acknowledgement**

11/06/2017

Page 1 of 1

GILL RAGON OWEN, P.A.
425 W CAPITOL AVE, STE 3800
LITTLE ROCK AR 72201

Filing Fee:        $5.00

Total Fee:        **$5.00**

The California Secretary of State's Office has received and filed your document. The information below reflects the data that was indexed in our system. Please review the information for accuracy. Included is an image of the filed document to assist you in your review. If you find a potential error, please notify the UCC Section at the number listed below at your earliest convenience.

Filing Type: **Financing Statement**        File Date: **11/06/2017**        File Time: **12:59**

Filing Number: **17-7614938945**        Lapse Date: **11/06/2022**

Debtor(s):
ORGANIZATION        **FIRST CAPITAL REAL ESTATE INVESTMENTS, LLC**

**2377 GOLD MEADOW WAY, STE. 100 GOLD RIVER CA USA 95670**

Secured Party(ies):
ORGANIZATION        **CTHC HOLDINGS, LLC**

**P.O. BOX 891 BRYANT AR USA 72189**

Filing by  the Secretary of State is not conclusive proof  that all conditions for securing priority have been met. Ensuring that accurate information is on the document to be filed is the responsibility of the filing party. If this filing is challenged, the Secretary of State does not guarantee that the filing is legally sufficient to secure priority under UCC Article 9 and expressly disclaims any liability for failure of the filing party to secure priority resulting from the information contained in the filed document, or the lack of information   on the filed document.

UNIFORM COMMERCIAL CODE 1500 11TH STREET, 2ND FL.  ·  SACRAMENTO, CA 95814  ·  PO BOX 942835  ·  SACRAMENTO, CA 94235-0001  ·  (916) 653-3516  ·  HTTPS://UCCCONNECT.SOS.CA.GOV

PROGRAMS  ARCHIVES, BUSINESS PROGRAMS, ELECTIONS, INFORMATION TECHNOLOGY, CALIFORNIA STATE HISTORY MUSEUM,
MANAGEMENT SERVICES, SAFE AT HOME, DOMESTIC PARTNERS REGISTRY, NOTARY PUBLIC, POLITICAL REFORM

# UCC FINANCING STATEMENT

**FOLLOW INSTRUCTIONS**

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>Owen Carolyn<br>501-376-3800 | |
| **B. E-MAIL CONTACT AT FILER (optional)** | |
| **C. SEND ACKNOWLEDGMENT TO: (Name and Address)**<br>Gill Ragon Owen, P.A.<br>425 W Capitol Ave, Ste 3800<br>Little Rock, AR 72201<br>USA | **DOCUMENT NUMBER:** 65136730002<br>**FILING NUMBER:** 17-7614938945<br>**FILING DATE:** 11/06/2017 12:59<br><br>**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**<br>**THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY** |

**1. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | **1a. ORGANIZATION'S NAME**<br>First Capital Real Estate Investments, LLC | | | | |
|---|---|---|---|---|---|
| OR | **1b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | | **SUFFIX** |
| | **1c. MAILING ADDRESS**<br>2377 Gold Meadow Way, Ste. 100 | **CITY**<br>Gold River | **STATE**<br>CA | **POSTAL CODE**<br>95670 | **COUNTRY**<br>USA |

**2. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | **2a. ORGANIZATION'S NAME** | | | | |
|---|---|---|---|---|---|
| OR | **2b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | | **SUFFIX** |
| | **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| | **3a. ORGANIZATION'S NAME**<br>CTHC Holdings, LLC | | | | |
|---|---|---|---|---|---|
| OR | **3b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | | **SUFFIX** |
| | **3c. MAILING ADDRESS**<br>P.O. Box 891 | **CITY**<br>Bryant | **STATE**<br>AR | **POSTAL CODE**<br>72189 | **COUNTRY**<br>USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

Any and all collateral described in that certain Pledge and Security Agreement dated as of December 2, 2016, executed and entered into by and between First Capital Real Estate Investments, LLC ("Debtor"), and CTHC Holdings, LLC, and/or its successors and assigns; said collateral including but not limited to the following:

All equity interests in United Realty Capital Operating Partnership, LP (Issuer) under certificate number UROP-100107 representing 466,565 units.

**5.** Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)  ☐ being administered by a Decedent's Personal Representative

| **6a.** Check <u>only</u> if applicable and check <u>only</u> one box: | **6b.** Check <u>only</u> if applicable and check <u>only</u> one box: |
|---|---|
| ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien  ☐ Non-UCC Filing |

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**

**FILING OFFICE COPY**



One Information Way
Ste 300
Little Rock, AR 72202
501.663.3306
FAX 501.614.7832

**HEARTLAND**
**B A N K**          October 31, 2017

**EXHIBIT D**

**FIRST CLASS MAIL, POSTAGE PREPAID AND**
**CERTIFIED MAIL, RETURN RECEIPT REQUESTED,**
**ADDRESSEE OR AGENT OF ADDRESSEE ONLY**


**First Capital Real Estate Investments, LLC f/k/a Freedom Capital Investment**
**Management, LLC (FCIM)**
**FCIC Advisors LLC (f/k/a Freedom Capital Investment Advisors LLC)**
**First Capital Investment Corporation (f/k/a Freedom Capital Corporation)**

Attn: Suneet Singal, Director
512 Alta Vista
El Dorado Hills, CA 95762


          Re:    Heartland Bank Loan No. Ending 3420

Dear Mr. Singal:

          This letter is to notify you that Loan No. ████████3420 ("the Loan"), in the original principal amount of $863,487.00, is past due as of August 2, 2017.  Due to this default, and other violations of your loan covenants, Heartland Bank has declared all principal, interest, late charges and other amounts due and owing.  As of the date of this letter, you owe Heartland Bank the amount of $755,809.72, plus interest accruing from the date of this letter at a daily rate of $143.73768, plus all other charges, which will include attorney's fees and costs and all amounts advanced to protect Heartland Bank's interest in the property and assets ("the collateral") that secures the Loan.

          This letter constitutes Heartland Bank's acceleration of the total amount owed on the Loan and further constitutes formal demand for full payment of the Loan.

          **This letter provides you with notice that if your account is not paid in full by CERTIFIED FUNDS on or before the close of five (5) calendar days from the date of your receipt of the certified mail or the first class postage prepaid mail being forwarded to you, or if you fail to receive either of the foregoing, five (5) days from the date of this letter, we will file a lawsuit against you and all others liable on the debt to collect the amount due and owing on the Loan, to obtain a personal judgment against all parties liable on the Loan, and to replevin the Property.**

If you wish to make arrangements to avoid litigation, you should immediately contact me at my direct number of (501) 663-3845 or the main Heartland Bank number of (501) 663-3306.

Very truly yours,

HEARTLAND BANK

By _____
Phil Thomas
EVP/CLO

Cc:  Rick Williams, Pledgor CTHC Holdings, LLC
     Bob Froehlich, Director
     Frank Grant, Director
     **Jeff McClure, former CEO Freedom Capital**

EXHIBIT E



GILL
RAGON
OWEN
A T T O R N E Y S

GILL RAGON OWEN, P.A.
ATTORNEYS AT LAW
425 WEST CAPITOL AVENUE, SUITE 3800
LITTLE ROCK, ARKANSAS 72201
TELEPHONE (501) 376-3800
FACSIMILE (501) 372-3359
www.gill-law.com

_____
KELLY W. MCNULTY | ATTORNEY
EMAIL: mcnulty@gill-law.com

November 6, 2017

Suneet Singal
2377 Gold Meadow Way, Suite 100                    **Via Federal Express**
Gold River, California 95670

      **RE:   Pledge and Security Agreement (the "Security Agreement") dated as of
December 2, 2016 by and between First Capital Real Estate Investments, LLC
("First Capital") and CTHC Holdings, LLC ("CTHC")**

Mr. Singal,

This firm represents CTHC. As you know, CTHC mortgaged certain real estate located in Saline
County, Arkansas to Heartland Bank ("Heartland") in order to provide collateral support for a
loan from Heartland to First Capital (the "Loan").  In order to secure First Capital's obligations
with respect to the Loan, First Capital pledged to CTHC a security interest in 466,565 OP Units
in United Realty Capital Operating Partnership, LP (the "Pledged Equity Interests").

We have received a copy of a letter from Heartland to you in which it states that the Loan is in
default and that Heartland has accelerated all amounts owed on the Loan.  This Loan default also
constitutes an "Event of Default" under the Security Agreement.   Pursuant to Section 5.2 of the
Security Agreement, First Capital shall have ten (10) days following an Event of Default to cure
such Event of Default.

We demand that you immediately (1) cure the Event of Default, (2) provide us with true,
complete and accurate books and records with respect to United Realty Capital Operating
Partnership, LP and the Pledged Equity Interests, including, without limitation, a copy of the
current partnership agreement of Realty Capital Operating Partnership, LP, as amended, and its
most current available financial statements, (3) provide us with originals of all certificates
evidencing any Pledged Equity Certificates, and (4) deliver to CTHC any future certificates
relating to the Pledged Equity Certificates and any proceeds or distributions in connection
therewith.

Suneet Singal
November 6, 2017
Page 2

My client has directed me to take all action necessary to enforce its rights under the Security Agreement if these demands are not met.  Please direct any further communication regarding this matter to this office.  Your immediate attention is required.

Cordially,

*Kelly W. McNulty*

Kelly W. McNulty

KWM/ddg